CHARLES P. DIAMOND (SB # 56881)
LAW OFFICES OF CHARLES P. DIAMOND
cdiamond@omm.com
AMY R. LUCAS (SB # 264034)
alucas@omm.com
O'MELVENY & MYERS LLP
1999 Avenue of the Stars, 8th Floor
Los Angeles, California  90067-6035
Telephone:  +1 310 553 6700
Facsimile:   +1 310 246 6779

RICHARD P LASTING (SB # 53950)
RICHARD P LASTING LAW OFFICES
richardplasting@sbcglobal.net
315 East 8th Street, Suite 801
Los Angeles, CA 90014
Telephone: +1 213-489-9025
Facsimile:  +1 310-626-9677

Attorneys for Defendant
JUAN SANCHEZ

(Additional Counsel on Subsequent Page)

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**WESTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>            Plaintiff,<br><br>      v.<br><br>MICHAEL LERMA, et al.,<br><br>            Defendants. | Case No. 2: 18- CR-172-GW<br><br>**DEFENDANTS' JOINT MOTION FOR NEW TRIAL BASED ON (1) EXCLUSION OF EXPERT TESTIMONY OF ROY "TIM" GRAVETTE, AND (2) LIMITATIONS ON JOSE MARTINEZ CROSS-EXAMINATION, AND MEMORANDUM IN SUPPORT OF SAME**<br><br>HEARING DATE: DEC. 8, 2025<br>TIME: 8:00 A.M.<br>COURTROOM: 9D<br>HON. GEORGE H. WU |

MARRI B. DERBY (SBN107209)
marri@marriderbylaw.com
23 Corporate Plaza Suite 150
Newport Beach, CA 92660
Phone: 949-510-4785; Fax: 949-608-7034

Attorneys for Defendant MICHAEL LERMA

KENNETH M. MILLER (SB 151874)
Kmiller@bmkattorneys.com
903 Calle Amanecer, Suite 350
San Clemente, CA 92673
Phone: 949-369-3700; Fax: 949-496-6753

RICHARD G. NOVAK (SB 149303)
Richard@RGNLaw.com
P. O. Box 5549
Berkeley, CA 94705
Phone: 626-578-1175; Fax: 626-685-2562

Attorneys for Defendant CARLOS GONZALEZ

SHAUN KHOJAYAN (SB 197690)
shaun@khojayan.com
515 S. Flower St., 19th Floor
Los Angeles, CA 90071
Phone: 310-274-6111; Fax 310-274-6211

DANIEL A NARDONI (SB 94201)
dan@nardonilaw.net
215 North Marengo Avenue Suite 328
Pasadena, CA 91101
Phone: 626-578-9872; Fax: 626-578-9873

Attorneys for Defendant JOSE VALENCIA GONZALEZ

## **MOTION FOR NEW TRIAL**

TO THIS HONORABLE COURT, THE UNITED STATES OF AMERICA

AND ITS COUNSEL:

PLEASE TAKE NOTICE THAT on December 8, 2025, defendants will

move, pursuant to Federal Rule of Criminal Procedure 33, for a new trial based on

the exclusion of expert testimony of former BOP Associate Warden Roy T. ("Tim")

Gravette and the undue curtailment of their right to confront adverse witness Jose

Martinez by restrictions the Court placed on his cross-examination.

This motion is based upon the attached memorandum of points and

authorities and exhibits thereto, and any other matters that the Court may consider

at the hearing on this motion.

Dated: September 22, 2025

Respectfully submitted,

RICHARD P. LASTING
CHARLES P. DIAMOND
AMY R. LUCAS

By:  */s/ Charles P. Diamond*

Charles P. Diamond
Attorneys for Defendant Juan Sanchez

On Behalf of Defendants Michael Lerma,
Carlos Gonzalez, Jose Valencia Gonzalez
and Juan Sanchez

# TABLE OF CONTENTS

MOTION ……………………………………………………………………… iii

I.     INTRODUCTION .................................................................................. 1

II.    THE COURT ERRED IN EXCLUDING GRAVETTE'S EXPERT
       TESTIMONY ABOUT THE BOP'S ASSIDUOUS ENFORCEMENT OF
       ITS COUNT POLICIES AND ITS PROMINENT PLACE IN
       CORRECTIONAL OFFICER CULTURE ...................................................... 3

       A.     RELEVANT BACKGROUND ...................................................... 3

       B.     LEGAL STANDARD FOR GRANTING A NEW TRIAL ................. 7

       C.     DEFENDANTS' EXPERT ON BOP POLICIES AND
              PROCEDURES SHOULD NOT HAVE BEEN EXCLUDED ........... 7

              1.     Gravette's Testimony Was Admissible Under Federal
                     Rule of Evidence 702 ................................................... 7

              2.     The Court Improperly Transformed Issues of Weight into
                     Issues of Admissibility. ............................................... 10

       D.     The Exclusion of Gravette's Testimony Prejudiced the Verdict. ....... 13

III.   THE COURT IMPROPERLY DENIED DEFENDANTS THEIR SIXTH
       AMENDMENT RIGHT TO CONFRONT AND CROSS EXAMINE
       THEIR ACCUSER BY UNDULY RESTRICTING AND PRECLUDING
       CROSS EXAMINATION OF JOSE MARTINEZ REGARDING  HIS
       "SPICE" USE AND DOCUMENTED INSTANCES OF THE PSYCHOTIC
       EPISODES IT INDUCED IN HIM ................................................. 15

IV.    DEFENDANTS WERE DENIED THEIR CONSTITUTIONAL RIGHT TO
       PRESENT A COMPLETE DEFENSE. ........................................ 18

V.     CONCLUSION .......................................................... 20

# TABLE OF AUTHORITIES

## Cases

*Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013) ……………………………………………………………………………. 8

*California v. Trombetta*, 467 U.S. 479, 485 (1984) ………………………… 18

*City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1044 (9th Cir. 2014) .. 11

*Crane v. Kentucky*, 476 U.S. 683, 690–91 (1986) ………………………… 19

*Davis v. Alaska,* 415 U. S. 308, 318 (1974) ……………………………….. 17

*Delaware v. Fensterer,* 47 U. S. 15, 20 (1985) (per curiam) ……………… 17

*Delaware v. Van Arsdall,* 475 U.S. 673, 680 (1986) ………………………… 17

*Fair v. King Cnty,* 2025 WL 1031274, at *10 (W.D. Wash. Apr. 7, 2025) . 11

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141–42 (1999) ……………… 8

*also In re Viagra (Sildenafil Citrate) & Cialis (Tadalafil) Prods. Liab. Litig.*, 424 F. Supp. 3d 781, 786 (N.D. Cal. 2020) ………………………………………… 11

*Murdoch v. Castro,* 609 F. 3d 983, 989 (9th Cir. 2010) (en banc) …………… 17

*Pennsylvania v. Ritchie,* 480 U.S. 39, 53 (19870 (plurality opinion) ………. 17

*Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010) ……………………….. 8,9,11

*See Pyramid Techs., Inc. v. Hartford Cas. Ins. Co.*, 752 F.3d 807, 814 (9th Cir. 2014) ……………………………………………………………………….. 13

*Rosa v. City of Newberg*, 2021 WL 1348260, at *4 (D. Or., Apr. 12, 2021) … 11

*United States v. Alvarez-Moreno*, 657 F.3d 896, 901 (9th Cir. 2011) ……….. 7

*United States v. French*, 748 F.3d 922, 934 (9th Cir. 2014) ………………… 7

*United States v. Kellington*, 217 F.3d 1084, 1095 (9th Cir. 2000) …………… 7

*United States v. Mechanik*, 475 U.S. 66, 72 (1986) …………………………. 7

*U.S. v. Pang*, 362 F.3d 1187, 1192 (9th Cir. 2004) ………………………….. 13

*United States v. Pimentel*, 654 F.2d 538, 545 (9th Cir. 1981) ……………….. 7

*United States v. Vallejo*, 237 F.3d 1008, 1019 (9th Cir. 2001) ……………… 8

*U.S. v. Yazzie*, 976 F.2d 1252, 1255 (9th Cir. 1992) ………………………… 13

*Washington v. Texas*, 388 U.S. 14, 19 (1967) ……………………………… 19

**Rules**

F.R.C.P. 16(b)(1)(c) …………………………………………………..… 3

F.R.C.P. 33(a) …………………………………………………………….. 7

F.R.E. 702 …………………………………………………………… 8,12

**Constitutional Provisions**

U.S. Constitution Amend VI ………………………………………….. 15,17

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

Pursuant to Federal Rule of Criminal Procedure 33(a), defendant Juan Sanchez respectfully moves for a new trial, in which his co-defendants join. The jury convicted defendants only after the Court excluded—over defendants' timely objection—critical expert testimony by Roy T. ("Tim") Gravette, a former Bureau of Prisons ("BOP") Associate Warden with twenty years of institutional experience. Had he been permitted to testify, Gravette would have amplified evidence offered by Heriberto Tellez and Doralisa Alaniz, respectively the former warden and a current correctional officer ("CO") of the Metropolitan Detention Center-Los Angeles ("MDC-LA").  Both testified about MDC inmate-accountability procedures in effect when inmate Steven Bencom was murdered (June 28 or 29, 2020)—specifically the conduct of the "count"— and in the case of CO Alaniz, how she believed she counted Mr. Bencom the day of his alleged murder.  Their evidence established that, had the count been conducted according to policy— which, according to CO Alaniz, it was—Mr. Bencom could not have been stabbed and strangled to death at 2:45 pm on June 28 as the government contended[1] since Alaniz recorded him as standing on his feet for both the 4 pm and 9 pm "stand-up" counts she conducted that day.  Had the jury credited the testimony, it could not have convicted the defendants for the Bencom murder as he remained lock in his cell in the company of only his cellmate—who is also defendants' principal accuser—until correctional officers discovered his body the next morning.

Equally erroneous and prejudicial was the Court's refusal to permit robust cross-examination of defendants' accuser, Bencom cellmate Jose Martinez, the government's sole witness professing knowledge that tied defendants to the murder.

---

[1] Because of COVID-19 related quarantine procedures limiting contact among inmates, defendants would not have had access to Mr. Bencom after roughly 3 pm, and the government did not contend otherwise.

DEFENDANTS' JOINT MOTION FOR NEW TRIAL

By his own admission, Martinez was under the influence of his drug of choice, spice (a highly-potent synthetic cannabinoid), before the time he claims his cellmate was murdered until the next morning.  Both expert and inmate testimony linked the use of spice, particularly the regular use Martinez made of it, to psychotic (in inmate parlance, "crazy") and paranoid behavior.  Martinez denied it, allowing the government to argue to the jury that it just induced sleepiness.  Despite this, the Court precluded Sanchez' counsel from cross-examining Martinez about documented instances of correctional officers observing bizarre and aggressive behavior following his use of the drug.  It compounded the error by then refusing to permit cross-examination that prior to trial, Martinez sought to have surgically removed body tattoos that identified him as a "killa".

The government procured the murder convictions, and with it convictions for racketeering conspiracy that has as an object the Bencom murder, by convincing the jury that Bencom was murdered on the afternoon of June 28, 2020 as Martinez claimed, and not late that night or the following morning when Bencom was locked alone with Martinez.  Defendants offered compelling medical forensic evidence, from both its expert and the government's, that Bencom was far more likely to have been murdered closer in time to the discovery of his body, June 29, 2020, than the prior afternoon.  To reject it, the jury necessarily had to conclude that Correctional Officer Alaniz ignored BOP policy concerning "stand-up" counts (allowing Bencom to have been counted that afternoon while prone on his deathbed) and to credit Martinez' testimony that defendants, and not he, committed the murder.  By excluding evidence that manifestly would have weighed in the opposite direction, the Court improperly put its finger on the scale to defendants' detriment, requiring that they be given a new trial in which the excluded evidence is admitted.

DEFENDANTS' JOINT MOTION
FOR NEW TRIAL

## II. THE COURT ERRED IN EXCLUDING GRAVETTE'S EXPERT TESTIMONY ABOUT THE BOP'S ASSIDUOUS ENFORCEMENT OF ITS COUNT POLICIES AND ITS PROMINENT PLACE IN CORRECTIONAL OFFICER CULTURE

Defendants tendered Mr. Gravette to bolster Tellez' and Alaniz' testimony by establishing that within BOP culture, "count" procedures are not regarded as paper regulations; that they are foundational to the correctional system's defining responsibilities of regularly accounting for the whereabouts of inmates, assuring that they are alive and well, and protecting them from one another. He would have also testified that BOP officers are trained and ingrained to regard count procedures as sacrosanct and to be followed to the letter. In the absence of his testimony, the government successfully demeaned count procedures, equating them with regularly-ignored prison rules, like those prohibiting salacious "pin-ups" and laundry clotheslines. Without Gravette offering a very different picture of the count, the government was able to offer essentially uncontradicted inmate testimony that MDC correctional offices were indifferent about their enforcement, which fatally undercut defendants' time-of-death defense. Because the exclusion of Gravette's expert testimony was not harmless, the Court should grant a new trial at which he is permitted to testify.

### A. RELEVANT BACKGROUND

On December 17, 2024, the defense disclosed Gravette pursuant to Federal Rule of Criminal Procedure 16(b)(1)(C) (ECF No. 1327 at 2), and it supplemented its disclosure on January 13, 2025. Together, those notices detailed Mr. Gravette's opinion that Bencom could not have been murdered during the early afternoon of June 28, 2020, as the government and one witness contended. He reached this conclusion relying (1) on BOP inmate count policies and the MDC's institutional supplement, which require inmates to be standing at 4 pm and 9 pm in order to be counted, and (2) on the reports of CO Alaniz and a second officer that Bencom was counted as alive and well following both the 4 pm and 9 pm counts. His notice

further disclosed his intention to testify that count policies "are not pro forma," that they are core to the BOP's mission, that they are the subject of rigorous and ongoing correctional officer training and enforcement, and that they are sacrosanct as a matter of correctional officers' culture.

On January 6, 2025, the Government sought to exclude Gravette's testimony as unreliable and speculative. (ECF No. 1327 at 14-17). The defense's Joint Opposition explained the relevance and importance of Gravette's testimony and that it derived from his twenty years' of BOP experience at six different federal correctional facilities, including detention facilities like the MDC, as well as his continuing post-retirement employment in various correctional capacities and consultation in more than 300 correctional lawsuits, many involving federal facilities. (ECF No. 1411 at 6-9).

On January 31, 2025, the Court issued its Tentative Rulings on Motions in Limine and tentatively excluded Gravette's testimony. (ECF 1498 Tentative Rulings at 13-14). At the February 10, 2025 pretrial conference, the Court questioned the need for Gravette's testimony, observing that the jury could be expected to presume, *in the absence of contrary testimony*, that Mr. Bencom was standing, and not lying mortally wounded, at 4 pm and 9 pm if the records reflected his presence at those stand-up counts. Ex A 2/10/2025 Tr 54:1-3; 55:12-14 ("If you get a Bureau of Prisons person witness who testifies they are not taken seriously, then okay. I will allow you to call Mr. Gravette at that situation. . . . If you don't get it from them, if they testify something to the contrary, I will allow Mr. Gravette to come in, but otherwise, I don't see the need.").

At trial, the government made repeated efforts, during the direct testimony of its witnesses and cross-examination of the defendants', to show that correctional officers did not take the "count" seriously and were lax in requiring inmates to stand at 4 pm and 9 pm. For example, the government elicited from one cooperating inmate witness, who was also an MDC 6 North resident, that

DEFENDANTS' JOINT MOTION FOR NEW TRIAL

1  correctional officers, including CO Alaniz, frequently counted as present inmates

2  who were not standing for the stand-up count.  Witness Andrew Jackson testified

3  that for stand-up counts, he sometime stood but for others did not.  ECF 1716 at

4  210:21-25. According to Jackson, after announcing a stand-up count, "sometimes

5  officers –they tell you to stand up, [but] they just walk by."  He added that CO

6  Alaniz "didn't make [him] stand up," adding on redirect that "she wasn't strict."

7  ECF 1716 at 211:4-9;236:8-12.

8      The government adduced similar testimony from Mr. Bencom's cellmate and

9  the defendants' principal accuser, Jose Martinez.  When asked about the 4 pm count

10  conducted after he said defendants murdered his cellmate, Martinez testified that

11  not all officers played "by the book," and that the officers on 6 North were not "by

12  the book," ECF 171 at 220-222:23-25;1-25;1-2.  According to Mr. Martinez, on the

13  night of the murder neither officer demanded that he or Mr. Bencom stand for either

14  the 4 pm or 9 pm counts.  ECF 1717 at 220:8-14.

15      The government hammered home this theme during defendants' case-in-

16  chief.  Although it avoided directly asking BOP witnesses whether they took the

17  count seriously (to avoid disturbing the door the Court said such testimony might

18  reopen), on cross-examination by the government, CO Alaniz agreed that she

19  frequently failed to enforce *other non-count* BOP regulations, including those

20  prohibiting salacious photographs, privacy curtains and clotheslines.  The

21  government's cross-examination of former Warden Tellez came closer to

22  impugning MDC guards' diligence in conducting counts and the reliability of

23  documents attesting that they had been done properly.  ECF 1719 at 113:7-14

24  ("[The count slips do] not tell you, correct me if I'm wrong, that does not tell you

25  that the correctional officers actually executed the stand-up [count]? . . . So the

26  count slips, themselves, they aren't going to tell you if a correctional officer actually

27  did their job or not, correct? A Correct.  Q  All it tells you is that a correctional

28  officer knows how many inmates are supposed to be in a specific area and then puts

- 5 -

1    that number down. A. Correct.”).

2        As it had done with CO Alaniz, government counsel also coaxed from the

3    former Warden admissions that other, non-count prison rules were not routinely

4    followed.  Over objection from the defense, the Court shifted its pretrial position

5    and allowed the government to adduce testimony that the count policies were not

6    routinely followed.  ECF 1719 at 116:12-17 (“[Government counsel] is entitled to

7    ask him about the enforcement of these policies, which is ones you referred to [the

8    count], not the ones about the other stuff, he's talking about the ones about the

9    count, and he is entitled to question him about that, so I will allow him to do so.”)

10   And the government took full advantage, as evidenced by the colloquy of

11   government counsel and the former Warden:

12              Q In terms of following these policies and these
13              procedures and ways to ensure that these policies are
                followed up, it would depend on the individual employee
14              to implement that?

15              A The shift lieutenant.

16              Q It would depend on that lieutenant to enforce that?

17              A That would be up to the lieutenant, that is correct, sir.

18              Q Likewise, it would depend on the correctional officer
19              down at the scene to decide whether or not to enforce the
                policies that they have been trained on?
20

21              A They should be enforcing it.

22              Q Should be?

23              A Correct.

24              Q But it was up to them at the end, correct?

25              A That is correct, sir.

26              Q Correctional officers are humans?

27              A Yes, sir.

28              ECF 1719 at 120-121:17-25;1-11

- 6 -                                           DEFENDANTS' JOINT MOTION
                                                 FOR NEW TRIAL

The Court having excluded Mr. Gravette, the government's insinuation that the BOP's count policies were no better than the paper on which they written went unrebutted. As a result, after a lengthy deliberation, the jury convicted defendant Sanchez and his three co-defendants on March 28, 2025.

### B.    LEGAL STANDARD FOR GRANTING A NEW TRIAL

Pursuant to Federal Rule of Criminal Procedure 33(a), the Court may "grant a new trial if the interest of justice requires." Fed. R. Crim. Pro. 33 (a); *see also United States v. French*, 748 F.3d 922, 934 (9th Cir. 2014). The burden rests with the defendant, *United States v. Alvarez-Moreno*, 657 F.3d 896, 901 (9th Cir. 2011), and "a motion for new trial is directed to the discretion of the district judge," *United States v. Pimentel*, 654 F.2d 538, 545 (9th Cir. 1981). Notably, "a district court's power to grant a motion for a new trial is much broader than its power to grant a motion for judgment of acquittal." *United States v. Kellington*, 217 F.3d 1084, 1095 (9th Cir. 2000). Unlike a challenge to the sufficiency of the evidence under Federal Rule of Criminal Procedure 29, in evaluating a motion for a new trial under Federal Rule of Criminal Procedure 33, "the district court need not view the evidence in the light most favorable to the verdict, and it is free to weigh the evidence and evaluate for itself the credibility of the witnesses." *Id*. Ultimately, the "societal costs of reversal and retrial are an acceptable and often necessary consequence when an error in the first proceeding has deprived a defendant of a fair determination of the issue of guilt or innocence." *United States v. Mechanik*, 475 U.S. 66, 72 (1986).

### C.    DEFENDANTS' EXPERT ON BOP POLICIES AND PROCEDURES SHOULD NOT HAVE BEEN EXCLUDED

#### 1.    Gravette's Testimony Was Admissible Under Federal Rule of Evidence 702.

Gravette's opinions regarding inmate accountability, facility policies, and BOP correctional practices and culture satisfy the requirements of Federal Rule of Evidence 702 and should have been admitted. Rule 702 governs admission of expert testimony in federal court and states that a "witness who is qualified as an

expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702.  Furthermore, a district court's inquiry into admissibility is a flexible one. *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013).  "The district court is not tasked with deciding whether the expert is right or wrong," but rather whether the testimony has "substance such that it would be helpful to the jury." *Alaska Rent-A-Car*, 738 F.3d at 969–70.

Expert testimony must address an issue "beyond the common knowledge of the average layman." *United States v. Hanna*, 293 F.3d 1080, 1086 (9th Cir. 2002). Rule 702 is construed liberally in considering the admissibility of testimony based on other specialized knowledge. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141–42 (1999).  In evaluating proffered expert testimony, the trial court is "a gatekeeper, not a fact finder." *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010). Courts have interpreted Rule 702 to require that "[e]xpert testimony . . . be both relevant and reliable." *United States v. Vallejo*, 237 F.3d 1008, 1019 (9th Cir. 2001).  "Expert opinion testimony is relevant if the knowledge underlying it has a valid connection to the pertinent inquiry.  And it is reliable if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline." *Primiano*, 598 F.3d at 565.

Gravette satisfied these tests.  First, his professional experience qualified him to testify.  Gravette worked for over twenty years at the Bureau of Prisons, serving as a Correctional Officer, a Lieutenant, a Captain, and an Associate Warden.  In these capacities, he was directly responsible for implementing and enforcing BOP's inmate-count and accountability policies.  After retiring from the BOP in 2010,

DEFENDANTS' JOINT MOTION FOR NEW TRIAL

1   Gravette worked as a nationwide corrections consultant and litigation expert,

2   providing expertise in over three hundred matters.  He has testified as an expert at

3   trial or by deposition over thirty-seven times, including twice in this District, where

4   judges qualified him as a corrections expert in cases arising from the operation of

5   BOP institutions.  In addition to his consulting work, Gravette has remained active

6   in corrections work by conducting audits of correctional facilities.  Accordingly,

7   Gravette's continued activity in corrections work ensured that his knowledge of

8   prison-accountability operational manuals and policy statements, as well as the

9   assiduous degree with which they are enforced, remained current.  Moreover, from

10  his broad exposure to BOP facilities across the nation, Gravette was able to say that

11  BOP accountability policies and culture pervade uniformly across all BOP

12  institutions.  Taken together, Gravette's extensive professional experience,

13  combined with his continued involvement in corrections work and familiarity with

14  standardized BOP policies, established his qualifications and provided a solid

15  foundation for the reliability of his testimony.

16      Second, Gravette's methodology was reliable because it was solidly

17  grounded in his intimate knowledge of the inmate accountability practices and

18  policies of the BOP, and the application of standardized, nationwide BOP policies,

19  which have remained materially unchanged since his retirement.  In forming his

20  opinions, he applied his extensive knowledge of correctional standards to evaluate

21  the likelihood that a mid-afternoon homicide would have gone undetected for

22  seventeen hours, as the government and its witnesses maintained.  There is nothing

23  in the record to suggest that his methodology was unreliable; rather, it was based on

24  well-established, mandatory procedures that, based on his experience, are

25  rigorously enforced throughout the BOP system.  From personal experience,

26  Gravette knew that these policies are not aspirational; they are operationally

27  necessary and explicitly designed to ensure compliance. This framework adequately

28  supported Gravette's conclusions and made them non-speculative.

- 9 -

Third, Gravette's testimony was relevant and helpful to the jury. The timing of the discovery of Bencom's body, and whether institutional safeguards would have detected a mid-afternoon homicide, was the key disputed and pivotal fact in this case. Jurors likely did not have any personal knowledge of federal inmate count procedures, the hierarchy of staff responsibilities, or the disciplinary consequences for failing to comply with these procedures. Gravette's testimony was therefore essential to help the trier of fact understand the evidence. Particularly when the government dismissed them as trivial and subject to a particular correctional officer's whim, his explanation of how the importance of the count is drilled into correctional officers, refreshed by periodic training, and enforced through systems of discipline imposed both on inmates and employees would have shed light on operational realities that are far beyond the everyday experience of jurors. This context would have played a critical role in the jury's assessment of whether the Government's timeline was plausible and whether, as Gravette opined, correctional officers would have quickly discovered Bencom's murder had he been killed at 3:00 p.m. on June 28, 2020. Accordingly, because Gravette was qualified, his methodology was reliable, and his testimony was relevant and helpful to the jury, its exclusion was improper.

### 2. The Court Improperly Transformed Issues of Weight into Issues of Admissibility.

Concerns regarding Gravette's lack of employment in MDC-LA and any argument about staleness due to his retirement in 2010 go to the weight of the testimony, not its admissibility. *See City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1044 (9th Cir. 2014) ("Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion."). "When an expert meets the threshold established by Rule 702 as explained in *Daubert*, the expert may testify and the jury decides how much weight to give that testimony." *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010). By

excluding the testimony outright, the Court improperly substituted its judgment for
the jury's and denied jurors the opportunity to assess the expert's credibility and
conclusions.

First, it is of no consequence that Gravette did not work at MDC-LA. "[A]s
long as the expert's testimony is founded in sufficient knowledge or experience and
is based on reliable methods, an expert need not have identical practical experience
as the subject upon which the expert opines." *Rosa v. City of Newberg*, 2021 WL
1348260, at *4 (D. Or., Apr. 12, 2021) (finding an expert's testimony reliable
despite him not personally being involved with the subject of his testimony because
"Defendants will be able to cross-examine [the expert] on the issues related to his
qualifications and experience."). Specifically, the court in *Fair v. King Cnty* held
that "the location of [the expert's] correctional experience goes to the weight of his
testimony, not to its admissibility." 2025 WL 1031274, at *10 (W.D. Wash. Apr. 7,
2025). It found that "[t]o the extent that the . . . Defendants seek to challenge the
weight that should be afforded to [the expert's] opinion because he is an out-of-
state expert, this can be done via cross-examination." *Id. see also In re Viagra
(Sildenafil Citrate) & Cialis (Tadalafil) Prods. Liab. Litig.*, 424 F. Supp. 3d 781,
786 (N.D. Cal. 2020) ("So long as the expert's testimony is 'within the reasonable
confines of his subject area,' a lack of particularized expertise generally goes to the
weight of the testimony, not its admissibility.").

Here, Gravette's lack of tenure at MDC-LA might bear on the weight his
testimony is accorded, but it should not have dictated its admissibility. Except for
"minor local differences documented in institutional supplements, all BOP facilities
of like types operate identically and under the same operation manuals and policy
statements." (Gravette Decl. ¶ 3). Furthermore, the BOP policy statement Gravette
relied on in this case has not materially changed since his retirement. Notably,
Gravette has been qualified in this District to testify as an expert on the expected
level of inmate supervision at two federal correctional facilities, despite never

DEFENDANTS' JOINT MOTION
FOR NEW TRIAL

having visited them. (Supp. Decl. ¶ 7).  In neither case did the U.S. Attorney's Office object to his testimony nor attempt to exclude it. (*Id*).  Gravette's decades of experience with the BOP, coupled with his reliance on operational manuals and institutional supplements and training regimes that apply consistently across facilities, provide a solid foundation for his testimony.  Therefore, Gravette's lack of direct experience at MDC-LA should not have precluded him from testifying, as his qualifications, familiarity with standardized BOP policies, and prior acceptance as an expert in similar cases establish the reliability of his opinions, leaving any challenges to the weight of his testimony for cross-examination.

Second, Gravette's knowledge is not stale due to his continued work in the field.  Even if his knowledge were considered outdated, Rule 702 does not impose a temporal requirement for an expert's qualifications. Fed. R. Evid. 702.  Although Gravette retired from the BOP in 2010, he has consistently consulted on corrections policies, reviewed current manuals, and testified about modern BOP practices— including recent testimony in 2024 in this District. (Gravette Supp. Decl. ¶ 3).  His familiarity with current standards is further supported by the fact that BOP's operational manuals and policy statements concerning count procedures, which are designed to ensure consistency in operations, staffing, and security protocols across all facilities, have remained unchanged for decades.  (citation)  Any concerns about the staleness of Gravette's knowledge should have been raised through cross-examination, not pressed as a basis for excluding his testimony.

As the trial ultimately played out, the jury was required to evaluate competing narratives about MDC-LA staff compliance with inmate count procedures.  Gravette's testimony would have assisted the jury in assessing whether CO Alaniz and her fellow correctional officers followed the applicable policies, as they testified they did, during the relevant period.  If the Government believed Gravette's assumptions about compliance were flawed, it could have cross-examined him about specific compliance issues at MDC or presented contrary

DEFENDANTS' JOINT MOTION FOR NEW TRIAL

1   evidence, as it did anyway.  The jury, not the court, should have been given the

2   opportunity to determine how much weight to give his testimony in light of those

3   challenges. *See Pyramid Techs., Inc. v. Hartford Cas. Ins. Co.*, 752 F.3d 807, 814

4   (9th Cir. 2014) ("A district court should not make credibility determinations that

5   are reserved for the jury.").  Excluding Gravette's testimony deprived the jury of its

6   ability to weigh competing perspectives, undermining the adversarial process and

7   the jury's role as factfinder.

8         **D.**    <u>**The Exclusion of Gravette's Testimony Prejudiced the Verdict.**</u>

9        In the Ninth Circuit, an evidentiary exclusion that "more likely than not

10  affected the verdict" warrants reconsideration and, if necessary, a new trial. *U.S. v.*

11  *Pang*, 362 F.3d 1187, 1192 (9th Cir. 2004) ("[W]e will only reverse if an erroneous

12  evidentiary ruling 'more likely than not affected the verdict.'"); *U.S. v. Yazzie*, 976

13  F.2d 1252, 1255 (9th Cir. 1992) ("To decide whether the erroneous exclusion of the

14  lay witnesses' testimony requires the reversal of [defendant's] conviction, we must

15  determine whether the prejudice resulting from the error was more probably than

16  not harmless.") (internal quotations omitted).

17       The Court's decision to exclude Gravette's testimony was not harmless error

18  because it prejudiced the verdict.  The plausibility of the government's case turned

19  on whether the jury believed that CO Alaniz and her fellow officers did their jobs

20  on June 28, 2020.  If BOP protocol had been properly followed, Bencom could not

21  have been killed at 3 pm as the government and his cellmate maintained, because he

22  was observed standing during the 4 p.m. and 9 p.m. counts (and thereafter protected

23  from harm by a locked door until his cell was unlocked the following morning,

24  when the murder was discovered.)  The Government's narrative thus depended on

25  the jury accepting that CO Alaniz and her fellow officers did not do their jobs.

26       Given Gravette's exclusion, the battle over this issue was not a fair fight. As

27  noted earlier, the government used the testimony of CO Alaniz and former Warden

28  Tellez as a platform for suggesting that prison policies are not inviolate.  As to the

DEFENDANTS' JOINT MOTION
FOR NEW TRIAL

1  conduct of the stand-up count, it marshalled testimony of inmate witnesses
2  Martinez and Jackson that MDC guards counted inmates who were not standing
3  and that CO Alaniz and her fellow officers were not rigid enforcers of the stand-up
4  policy. This cumulative testimony painted a picture of an institution where BOP
5  rules were more aspirational than operational, and where inattentive staff could
6  plausibly fail to detect a murder for an extended period despite rules requiring
7  inmates to periodically stand to ensure their wellbeing.

8       Gravette was prepared to provide the jury with concrete, policy-based
9  context regarding BOP operational realities—specifically, that BOP indoctrination
10 of its correctional officers has inculcated a culture of enforcement of inmate
11 accountability policies including the stand-up count, who come to understand how
12 critical the procedures are to keep everyone safe.  His testimony would have
13 directly rebutted the government's anecdotal evidence by demonstrating that,
14 within BOP culture, the count is foundational to the correctional system and that
15 BOP officers are trained to regard count procedures as inviolable.  Without this
16 expert context, jurors were left to believe that BOP rules are routinely not followed
17 and with a one-sided presentation of life within the MDC based on the
18 unchallenged, anecdotal testimony of inmates.

19      The exclusion of Gravette's testimony thus deprived the jury of critical
20 information necessary to evaluate the government's theory that BOP accountability
21 rules were systematically disregarded.  The resulting prejudice to the defense was
22 substantial, as the jury was left with a distorted and incomplete understanding of
23 institutional procedures. Accordingly, the exclusion of Gravette's testimony was
24 not harmless and warrants a new trial.

25
26
27
28

DEFENDANTS' JOINT MOTION
FOR NEW TRIAL

**III.**   **THE COURT IMPROPERLY DENIED DEFENDANTS THEIR SIXTH AMENDMENT RIGHT TO CONFRONT AND CROSS EXAMINE THEIR ACCUSER BY UNDULY RESTRICTING AND PRECLUDING CROSS EXAMINATION OF JOSE MARTINEZ REGARDING HIS "SPICE" USE AND DOCUMENTED INSTANCES OF THE PSYCHOTIC EPISODES IT INDUCED IN HIM**

The defendants presented evidence that Bencom was strangled and stabbed to death in his cell after correctional officers locked down his unit for the night, leaving him only in the company of his cellmate, Jose Martinez.  As previously noted, the evidence consisted of testimony of a forensic pathologist that the state of Bencom's body when it was discovered (specifically, rigor and livor mortis) was only consistent with his death occurring in the early morning hours on June 29, 2020 when he was locked alone in the company of his cellmate, Martinez. Defendants bolstered the scientific evidence with testimony of CO Alaniz that she and a fellow-officer conducted and documented two separate "stand-up" counts, both after the government claimed the defendants murdered Bencom in his cell, and Bencom was standing for each.  This evidence strongly pointed the finger at Martinez, who admitted to being a habitual spice-user and using spice from the afternoon of June 28, 2020 before Bencom was killed into the next morning.  ECF 1717 at 278:6-22.  Martinez' admission was reinforced by government witness Benito Pitchardo, an education technician at MDC-LA, who observed Martinez at the time Bencom's body was discovered and who described Martinez as "stumbling," looking nervous, but not appearing to be upset as he headed off directly to the showers.  ECF 1712 at 97:1-25; 127:3-6

Trial testimony established spice, a synthetic form of cannabinoid, as a powerful, mind- and conduct-altering substance, the effects of which are amplified by frequent use such as Martinez'.  Defense expert, Dr. Mohini Ranganathan of the Yale Medical School, testified that spice could make the user aggressive and psychotic.  ECF 1714 at 128-131.  No contrary expert evidence was presented by the government.  Indeed, its witnesses corroborated Dr. Ranganathan.  Government

cooperating inmate witness Mark Landeros testified that Mexican Mafia rules prohibited the use of spice in California State Prison because it can cause users to become "paranoid," a person on spice can "start flipping out" and "go crazy." 1712 at 48:18-21. A second inmate-witness echoed Landeros. James Jordan testified to his observation that spice "makes you crazy." 1716 at 18-20.

Martinez contradicted all of this by claiming to have suffered no ill effects from spice. Although he admitted smoking spice while alone in the cell with Bencom, he told the jury that he "felt no effects from its use." 1717 at 278:6-22. Government counsel took full advantage and disputed defense assertions that a spice-fueled Martinez had killed his cellmate by arguing that, in Martinez' case, it simply made him feel lazy and lethargic, a statement inconsistent with the commission of an aggressive murder while in a psychotic state, as the defense contended.[2]

Martinez was lying, and the government was on notice of it. During trial the government for the first time turned over to the defense, prison records and incident reports detailing bizarre and aggressive behavior by Martinez while in custody after the murder of Bencom.[3] The defense sought to cross-examine Martinez about some of these incidents. One incident was Martinez fighting with another inmate (*see* Ex. D). A second incident was Martinez being found naked on his cell floor and acting in an incoherent manner (*see* Ex. C). But the Government objected to both, or any other post-Bencom-murder instance of Martinez' spice-induced conduct consistent with him being the aggressor. Following a sidebar discussion, the Court precluded the defense from cross-examining Martinez on the events detailed in these reports.

---

[2] The court reporter has not yet prepared the official version of the closing argument, held on March 25 and 26, 2025. The statement in the text appears at page 66, lines 11-14 of an unofficial version of the March 25 transcript.
[3] *See* Ex. C (Def's Ex. 4226 LS_026167-68); Ex. D (Def's Ex. 4227 LS_026148). See also ECF 1689. Since the Court sustained the government's objection to these lines of cross examination, the exhibits were not offered or admitted.

DEFENDANTS' JOINT MOTION
FOR NEW TRIAL

1  ECF 1717 at 286-291.

2      The Court also curtailed cross of Martinez designed to show his

3  consciousness of guilt.  At trial, and at the time of Bencom's murder, Martinez

4  sported the facial tattoo "Anybody Killa" and had the numbers 187, the California

5  Penal Code Section for murder, tattooed on his index finger.  Both boasted of a

6  cavalier attitude toward murder and the taking of a human life.  Not surprisingly,

7  prison records, also produced during trial, indicated that before it started, Martinez

8  had sought to have these tattoos surgically removed.  ECF 1717 at 243-245; Ex. B

9  (Def's Ex. 4221 LS_026181).  When the defense sought to cross-examine

10  Martinez' about his attempted spoliation, the government objected, and the Court

11  sustained the objection.

12      Both rulings deprived the defendants in a meaningful way their due process

13  right to present a defense, which includes the right to present a defense through the

14  cross examination of adverse witnesses.  The Sixth Amendment's Confrontation

15  Clause provides that '[i]n all criminal prosecutions, the accused shall enjoy the right

16  ... to be confronted with the witnesses against him." U.S. Const. amend VI.  The

17  Supreme Court has construed the clause as affording criminal defendants 'an

18  opportunity for effective cross-examination." *see, e.g. Pennsylvania v. Ritchie,* 480

19  U.S. 39, 53 (1987) (plurality op.).  Effective cross examination requires that a

20  defendant have "wide latitude" to question adverse witnesses at trial. *Id. citing*

21  *Delaware v. Fensterer,* 47 U. S. 15, 20 (1985) (per curiam); *Murdoch v. Castro,*

22  609 F. 3d 983, 989 (9th Cir. 2010) (en banc).  While the right to cross-examine is

23  not unlimited, a trial court may not restrict a defendant from "expos[ing] to the jury

24  facts from which the jurors ... could appropriately draw inferences relating to the

25  reliability of the witness." *Delaware v. Van Arsdall,* 475 U.S. 673, 680 (1986),

26  (quoting *Davis v. Alaska,* 415 U. S. 308, 318 (1974)).

27      Given the pivotal nature of Martinez' testimony—aside from dubious witness

28  testimony about supposed jailhouse confessions offered by cooperating inmates

DEFENDANTS' JOINT MOTION
FOR NEW TRIAL

with strong incentives to fabricate, Martinez was the sole witness to finger the defendants for Bencom's murder—the proffered Martinez cross-examination was essential to provide the jury with a complete picture of Martinez.   Its exclusion was not harmless.  Granted, defendants were allowed to adduce testimony of Martinez' spice use and, through Dr. Ranganathan and two separate lay inmate witnesses, its mind-altering effects and capacity to induce paranoia, aggressive and irrational behavior on some people.   But Martinez falsely denied that this was the case with him, and the Court's rulings kept from the jury directly contradictory reports that Martinez suffered such bouts of irrationality when using spice (which the government exploited in closing argument).  Evidence of instances of irrationality clearly would have made it more likely for the jury to find Martinez responsible for the murder of his cellmate.  It would have tended to prove that Martinez, not the defendants, killed Steve Bencom.  This is particularly true given the scientific evidence of a time of death when only Martinez could have committed the murder, and evidence from the correctional officer conducting them that Bencom was standing for two "stand-up" counts after Martinez claimed he had been savagely murdered.

        This was a close case.  The restrictions on relevant cross examination of the government's key witness, the person who murdered Steve Bencom, denied the defendants their right under Sixth Amendment to confront their accuser.

## IV.   DEFENDANTS WERE DENIED THEIR CONSTITUTIONAL RIGHT TO PRESENT A COMPLETE DEFENSE.

        The Due Process Clause requires that "criminal defendants be afforded a meaningful opportunity to present a complete defense." *California v. Trombetta*, 467 U.S. 479, 485 (1984).  The Supreme Court has emphasized that "few rights are more fundamental than that of an accused to present witnesses in his own defense." *Taylor v. Illinois*, 484 U.S. 400, 408 (1988).  "The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to

DEFENDANTS' JOINT MOTION FOR NEW TRIAL

present a defense, the right to present the defendant's version of the facts as well as

the prosecution's to the jury so it may decide where the truth lies.  Just as an

accused has the right to confront the prosecution's witnesses for the purpose of

challenging their testimony, he has the right to present his own witnesses to

establish a defense.  This right is a fundamental element of due process of law."

*Washington v. Texas*, 388 U.S. 14, 19 (1967).

Here, the Government's theory of the case rested entirely on the jury

believing that the count was not followed, making it plausible that the body of a

murder victim could have gone undiscovered throughout the night while multiple

counts were conducted, including two that would have required the victim to stand.

Defendant Sanchez should have been permitted to introduce expert testimony that,

given BOP policies and procedures and the culture of enforcement that pervades the

BOP, the counts on June 28, 2020, were likely followed.  It should have also

allowed defendants to cross-examine Martinez on documented instances of spice

causing him to behave bizarrely and aggressively.  The Court's exclusion of this

evidence is reminiscent of the imbalance the Supreme Court warned against in

*Crane v. Kentucky*, 476 U.S. 683, 690–91 (1986) (citations omitted):

> [The Constitution guarantees criminal defendants "a
> meaningful opportunity to present a complete
> defense."  We break no new ground in observing that an
> essential component of procedural fairness is an
> opportunity to be heard. That opportunity would be an
> empty one if the State were permitted to exclude
> competent, reliable evidence bearing on the credibility of
> a confession when such evidence is central to the
> defendant's claim of innocence. In the absence of any
> valid state justification, exclusion of this kind of
> exculpatory evidence deprives a defendant of the basic
> right to have the prosecutor's case encounter and "survive
> the crucible of meaningful adversarial testing."

By preventing defendants from introducing their proffered evidence, they were

DEFENDANTS' JOINT MOTION
FOR NEW TRIAL

deprived of their right to fully present a defense.  This warrants a new trial.

## V.    <u>CONCLUSION</u>

For the foregoing reasons, defendants respectfully request that the Court grant their motion for a new trial.

Dated:  September 22, 2025

Respectfully submitted,

RICHARD P. LASTING
CHARLES P. DIAMOND
AMY R. LUCAS

By: */s/ Charles P. Diamond*

Charles P. Diamond
Attorneys for Defendant Juan Sanchez

On Behalf of Defendants Michael Lerma, Carlos Gonzalez, Jose Valencia Gonzalez and Juan Sanchez

- 20 -

DEFENDANTS' JOINT MOTION
FOR NEW TRIAL

EXHIBIT A

1          THE COURT:  If you get a Bureau of Prisons person

2     witness who testifies they are not taken seriously, then okay.

3     I will allow you to call Mr. Gravette at that situation.

4          Otherwise, I don't see the need, because I don't see an

5     issue that says that any witness is going to say that you are

6     not supposed to follow these regulations and are meant to cover

7     safety of the inmates.

8          MS. DERBY:  Your Honor, I would just say that it's

9     for impeachment of the government's witnesses who are the

10    cooperators.

11         The government is relying on cooperators to say that

12    these rules were not followed.

13         THE COURT:  Let me put it this way --

14         MR. DIAMOND:  The question is the jury will have an

15    unanswered question, and that is, are these real or are they

16    paper, and you are saying --

17         THE COURT:  If any Bureau of Prisons witness gets up

18    on the stand when questioned about whether or not these

19    regulations are important, whether or not they are supposed to

20    be filed, whether or not the -- what you call it -- the

21    personnel will be disciplined if they are not followed, if the

22    answer is not to your satisfaction, then maybe I will allow

23    Mr. Gravette to testify, but otherwise I will --

24         MR. DIAMOND:  I'm equally concerned about the

25    unanswered question.

**UNITED STATES DISTRICT COURT**

1    The government can prove things the defense should be

2    allowed to prove things too that make it more likely that

3    something happened than it didn't.

4        THE COURT:  Mr. Gravette doesn't help you in that

5    regard.

6        MR. DIAMOND:  Mr. Gravette can testify it's more

7    likely that these guards followed regulations than they didn't.

8        For a lot of reasons, he can talk about the disciplinary

9    system, he can talk about --

10        THE COURT:  You can get that from the Bureau of

11    Prisons witnesses that are going to be called on the stand.

12    If you don't get it from them, if they testify something

13    to the contrary, I will allow Mr. Gravette to come in, but

14    otherwise, I don't see the need.

15        MR. DIAMOND:  I'm certainly not going to ask one of

16    the government's BOP witnesses, isn't it a fact your guards

17    routinely ignore these policies?

18        I'm not going to do that.

19        THE COURT:  Yeah, but you can ask him, do you

20    understand what policies -- are these policies applicable at

21    this point in time, should they not have been followed.

22        If they are not followed, aren't the guards supposed to

23    comply with this policy sanctioned disciplined for the failure

24    to comply with these regulations?

25        MR. DIAMOND:  Your Honor, I should be able to prove

# EXHIBITS B-D FILED UNDER SEAL