KENNETH M. MILLER (SBN 151874)
Ken@KMMillerLaw.com
26944 Camino de Estrella, Suite B
Capistrano Beach, California 92624
Phone: 949-388-3440

RICHARD G. NOVAK (SBN 149303)
Richard@RGNLaw.com
P. O. Box 5549
Berkeley, CA 94705
Phone: 626-578-1175

**Attorneys for Defendant**

**CARLOS GONZALEZ**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, <br> Plaintiff, <br> vs. <br> MICHAEL LERMA, ET AL., <br> Defendants. | **BEFORE THE HONORABLE GEORGE H. WU, DISTRICT JUDGE** <br> **Case No.: CR 18-00172-GW** <br> **DEFENDANT CARLOS GONZALEZ' NOTICE OF MOTION; MOTION FOR A NEW TRIAL AND FOR EVIDENTIARY HEARING; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATIONS OF JOHNNY MACIAS AND DANIEL NAVARRO** <br> **HEARING DATE: DEC. 8, 2025** <br> **TIME OF HEARING: 8:00 A.M.** |

TO THIS HONORABLE COURT, THE UNITED STATES OF AMERICA AND ITS COUNSEL: PLEASE TAKE NOTICE THAT on December 8, 2025, defendant Carlos Gonzalez, by and through his counsel of record, Kenneth M. Miller and Richard G. Novak, will and

hereby does move this Court for a new trial pursuant to Federal Rule of Evidence 33, and for an evidentiary hearing on this motion.

This motion is based upon the attached memorandum of points and authorities and declarations, and any other matters that the Court may consider at the evidentiary hearing on this motion.

Dated: September 22, 2025         Respectfully submitted

/s/ Richard G. Novak
Richard G. Novak
Kenneth M. Miller
**ATTORNEYS FOR DEFENDANT CARLOS GONZALEZ**

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.

## Introduction

On March 28, 2025, the jury returned its verdict as to Mr. Gonzalez and his three co-defendants after a trial that began on February 25, 2024. (ECF 1747) The jury's verdict includes, *inter alia*, findings of guilt for each of the four defendants as to the murder charged in counts seven and eight.

The lynchpin in the government's presentation of evidence in support of the charge that Mr. Gonzalez and his co-defendants murdered Steve Bencom was the testimony of Mr. Bencom's cellmate, Jose Martinez, whose moniker is "Slim". Without Mr. Martinez' testimony, the evidence would not have been sufficient to establish the guilt of the defendants in Mr. Bencom's murder. Mr. Martinez testified on March 12 and 13, 2025.

Mr. Martinez testified that some of the defendants required him to stay with Mr. Bencom's body overnight and not disclose to correctional officers that Bencom was unwell until the following morning. (ECF 1717 at 215-216:16-25; 1-2 at 216-217:14-25;1-21) Mr. Martinez testified that one or more of the defendants had threatened Mr. Bencom with harm concerning drug debts that he owed, that one or more told him that had he had run out of time to pay those debts (ECF 1717 at 202:22-25;203:1-21; ECF 1718 at 93:1-4), and that they had provided Mr. Martinez with food trays at his cell door so that he wouldn't' have to leave his cell during the time he was supposedly holed up with Mr. Bencom's body. (ECF 1718 25-26:5-25;1-7)

The primary theme of the defense case was that Mr. Martinez killed Mr. Bencom, that forensic evidence demonstrated that the timing

of Mr. Bencom's death could only have been after all inmates on 6 North were locked down for the night of June 28, 2020, and that the institutional counts, including stand-up counts demonstrated that Mr. Bencom was alive throughout the night and into the early morning of June 29. Mr. Martinez denied, under oath, that he killed Mr. Bencom. (ECF 1717 at 241:23-24)

Subsequent to trial and after the return of the verdicts, two MDC inmates have disclosed that close in time to Mr. Martinez' testimony in this matter, he admitted to them that he did, in fact, kill Mr. Bencom, and that he intended to falsely testify that Mr. Lerma and his co-defendants were responsible for the murder. The sworn declarations of these MDC inmates, Johnny Macias ("Mr. Macias") and Daniel Navarro ("Mr. Navarro"), are attached hereto as Exhibits A and B.

Mr. Macias states, under oath, that he was detained in the Special Housing Unit (SHU) at MDC-LA during the time period February through April of 2025. (Macias Decl. ¶2) While there, he came to know Mr. Martinez and knew that his nickname is "Slim." (Macias Decl. ¶3) According to Mr. Macias, Mr. Martinez is a talkative braggard and that he bragged, specifically, about killing his cellmate "by stabbing him in the eye and heart." (Macias Decl. ¶7) According to Mr. Macias, Mr. Martinez also told him that he was going to "pin" the murder on Mr. Lerma, that he was going to "take Michael Lerma down" and that he appeared to "hate Michael Lerma." (Macias Decl. ¶8) Mr. Macias' nickname is "Player." (Macias Decl. ¶2)

Mr. Navarro was housed in the SHU beginning in February 2025 as well. (Navarro Decl. ¶3) He was also in communication with Mr. Martinez whom he too knows as "Slim". (Navarro Decl. ¶4 ) According to Mr. Navarro, Slim passed to him multiple handwritten notes in

4

February and March of 2025. He explains that inmates and correctional officials refer to passed notes as "kites." (Navarro Decl. ¶¶6, 7)

Mr. Navarro states that Slim passed these kites to him through other inmates in the SHU, including an individual he knows as "Player." (Navarro Decl. ¶8) Player is Mr. Macias. (Macias Decl. ¶2)

According to Mr. Navarro, in the first kite that he received from Slim, Slim introduced himself and explained why he was in the SHU. Slim wrote, "I took out my cellie, was under a bad one." (Navarro Decl. ¶11) Mr. Navarro understood this to mean that Slim killed his cellmate while he was under the influence and was having a bad trip. (Navarro Decl. ¶12) Mr. Navarro's best recollection is that Slim's first kite also said, "I did something you're familiar with, I had to strangle him." (Navarro Decl. ¶12)

According to Mr. Navarro, Mr. Martinez also stated in this kite that he planned to testify against the inmates charged with the murder of his cellmate in order to "get less time." Mr. Martinez told him in that kite, "they did me wrong, now I'm doing them wrong." (Navarro Decl. ¶14)

Importantly, both Mr. Macias and Mr. Navarro state that Mr. Martinez invited them to join a prison gang he called the "Green Light Gang." (Macias Decl. ¶6; Navarro Decl. ¶17) Mr. Navarro explains that the Green Light Gang at MDC-LA is comprised of inmates who have dropped out of their gang, inmates who are acting as cooperating witnesses, and inmates who have been moved into protective custody for some other reason. (Navarro Decl. ¶5)

5

## II.

## Rule 33 Authorizes a New Trial Under These Circumstances

Rule 33 explicitly recognizes that newly discovered evidence is a basis for a new trial. Fed. R. Crim. Proc. 33(b)(1) (deadline for the filing of a motion for new trial based upon newly discovered evidence is three years after verdict).

A new trial may be granted on the basis of newly discovered evidence where the five following requirements are met: (1) the evidence must be newly discovered; (2) the failure to discover the evidence sooner must not be the result of a lack of diligence on the defendant's part; (3) the evidence must be material to the issues at trial; (4) the evidence must be neither cumulative nor merely impeaching; and (5) the evidence must indicate that a new trial would probably result in acquittal. *U.S. v. Harrington*, 410 F.3d 598, 601 (9th Cir., 2005); *U.S. v.* Kulczyk, 31 F.2d 542, 548 (9th Cir. 1991).

The Ninth Circuit has also explained that requirements factors 3, 4 and 5 are duplicative.

> Although we ordinarily state the test as comprising five requirements, we have recognized that requirements (3), (4), and (5) are duplicative. That is, newly discovered evidence is "material" when the result of the newly discovered evidence is that "a new trial would probably result in acquittal," a condition that is not usually met when the newly discovered evidence is "cumulative [ ]or merely impeaching." *See, e.g., United States v. Krasny*, 607 F.2d 840, 845 n.3 (9th Cir.

6

1979) (noting that the materiality and probability requirements "are really two means of measuring the same thing"); *United States v. Davila*, 428 F.2d 465, 466 (9th Cir. 1970) (per curiam) (noting that newly discovered impeachment evidence supports a new trial if "it is likely that the jury would have reached a different result" in light of the evidence). *United States v. Hinkson*, 585 F.3d 1247, 1284 (9th Cir. 2009).

## III.
## The Five Requirements for a New Trial based Upon Newly Discovered Evidence Are Met Here

### The Evidence is Newly Discovered

Neither Mr. Gonzalez nor his counsel were aware, prior to trial, that Mr. Martinez had admitted to at least two individuals at MDC that he personally killed Mr. Bencom, and that he had admitted that he intended to falsely testify that Mr. Lerma and his co-defendants were the killers.

Mr. Navarro's knowledge of Mr. Martinez' statements was not brought to undersigned counsel's attention until May 2025. Mr. Macias' conversations with Mr. Martinez were not known to defense counsel until September 2025.

### There is No Lack of Diligence

Under the circumstances presented here, there is no lack of diligence. Mr. Navarro and Mr. Macias are two among many hundreds or even thousands of different inmates who have been detained at MDC since Mr. Bencom's death. Mr. Martinez did not previously disclose to

7

1 law enforcement, nor to this court or the jury, that he had previously
2 admitted to anyone that he killed Mr. Bencom and that he intended to
3 testify falsely that the defendants were responsible for his death. Nor
4 is there any material produced by the government in the course of
5 discovery compliance which even hints that Mr. Martinez was
6 discussing the murder of Mr. Bencom with inmates in the SHU prior to
7 and during this trial. In fact, Mr. Martinez' physical location in the
8 months prior to trial was not disclosed to the defense until just prior to
9 the moment he was scheduled to testify.

    Mr. Gonzalez is not, at this time, suggesting that the government was aware of Mr. Martinez' statements to Mr. Navarro, Mr. Macias or others about Mr. Bencom's death. Of course, if it were, it would have had an obligation to disclose that information.

**Materiality**

    Testimony from two witnesses that Mr. Martinez admitted to them that he killed Mr. Bencom and that he intended to falsely testify that Mr. Lerma and his co-defendants where responsible for his death, as well as his admitted motives for testifying falsely are clearly material to the question presented in counts seven and eight: is there proof beyond a reasonable doubt that the defendants killed Mr. Bencom. The only new evidence that could arguably be more material than that proffered here, multiple corroborative admissions by Mr. Bencom's cellmate that he killed him, would be video evidence depicting the killer strangling and stabbing Mr. Bencom, and such evidence does not exist.

8

### **The Statements Attributed to Mr. Martinez Are Neither Cumulative Nor Merely Impeaching**

The evidence that Mr. Macias and Mr. Navarro would present at a new trial, as previewed by their declarations, is not cumulative of any evidence that already was or could have been presented at trial. There was no evidence presented that Mr. Martinez had admitted to killing Mr. Bencom, nor that he intended to testify falsely that others were responsible. It is wholly "new" evidence.

Nor is it merely impeaching. While Mr. Martinez' statements to Mr. Macias and Mr. Navarro do impeach his testimony, their statements are substantive evidence of the innocence of the defendants. Their testimony would be independently admissible at trial even if the government did not call Mr. Martinez as a witness.

### **The Evidence Indicates that a Re-trial Probably Would Result in an Acquittal on the Murder Charges**

In a case in which there is no eyewitness to the acts of violence which led to the death of Mr. Bencom, no recording of those acts, no recorded statements of any party admitting to committing those acts, and no forensic evidence tying any person or persons to those acts, evidence that Mr. Martinez admitted to two different persons that he killed Mr. Bencom probably would result in an acquittal of these defendants. Mr. Martinez clearly had the opportunity to kill Mr. Bencom, and there is independent evidence of the seriousness of his drug addiction, his excuse to Mr. Navarro for killing Mr. Bencom. As the Tenth Circuit has explained, "No one can doubt that a confession by another party to the crime for which petitioner has been tried and convicted, if discovered after conviction, would be grounds for a new trial." *Casias v. United States*, 337 F.2d 354, 356 (10th Cir. 1964).

## IV.

## An Evidentiary Hearing is Necessary

The decision of whether to hold an evidentiary hearing in support of a new-trial motion is within the sound discretion of the Court. *United States v. Scott*, 521 F.2d 1188, 1195-96 (9th Cir. 1975). A hearing is unnecessary "where there [is] nothing to be gained by such a hearing, id., or where a new-trial motion could be decided solely upon affidavits. *See United States v. Colacurcio*, 499 F.2d 1401, 1406 n.7 (9th Cir. 1974). However, "evidentiary hearings should be granted 'if the facts alleged, taken as true, would constitute grounds for a new trial.'" *United States v. Kerr*, No. CR-11-02385-PHX-JAT, 2016 U.S. Dist. LEXIS 95897, at *22 (D. Ariz. July 22, 2016); see also *United States v. Dorsey*, No. CR08-245-RSL, 2017 U.S. Dist. LEXIS 180368, at *29–30 (W.D. Wash. Oct. 31, 2017).

Cases involving confessions that another person committed the offense for which the defendant was convicted particularly warrant an evidentiary hearing. *See, e.g., United States v. Hamilton*, 559 F.2d 1370, 1373-74 (5th Cir.1977); *De Binder v. United States*, 303 F.2d 203, 204 (D.C. Cir. 1962). A district court abuses its discretion by denying an evidentiary hearing where it would lead to evidence that supports the grant of a new trial. See *United States v. Espinosa-Hernandez*, 918 F.2d 911, 913–14 (11th Cir. 1990); *De Binder*, 303 F.2d at 204.

Here, it is clear that the facts alleged in the declarations attached to this motion constitute grounds for a new trial. Mr. Martinez has confessed to committing the offenses for which Mr. Gonzalez and his codefendants were convicted. Assuming the government will not concede that the declarations, standing alone, warrant a new trial, it

1 would be an abuse of discretion to deny the defendants an evidentiary
2 hearing.

## V.

## Conclusion

For the reasons set forth above, Mr. Gonzalez moves this Court for an order granting him a new trial, and for an evidentiary hearing.

Dated: September 22, 2025  Respectfully submitted,

/s/ Richard G. Novak
Richard G. Novak
Kenneth M. Miller
**ATTORNEYS FOR DEFENDANT CARLOS GONZALEZ**

11

# EXHIBIT A

## DECLARATION OF JOHNNY MACIAS

I, Johnny Macias, declare as follows:

1. I am presently detained at the Los Angeles Metropolitan Detention Center ("MDC-LA").
2. I have the nickname of "Player".
3. During the months of February 2025 thru April 2025, I was housed on C Range of the Segregated Housing Unit (SHU) at MDC-LA.
4. During that time, I remember Jose Martinez who goes by "Slim" being housed on C Range too.
5. Slim talked all the time. He was a person who bragged a lot and was always looking out for himself, always talking about himself. For example, if you told him you had a certain type of car, he would say he had one like that, but it was better. I did not think he was trustworthy. I would describe him as a weasel.
6. He talked about the "Green Light Gang". He tried to recruit me into this gang. I told him I do not want to join any more STG's. STG's are security threat groups. I was in the SHU and am now in 7 North because I dropped out of gang life.
7. He bragged about killing his cellie by stabbing him in the eye and heart. At first, I thought he was just trying to look tough and bragging, like he thought it would bring him respect.
8. Later, he bragged that he was going to pin the murder of his cellie on Michael Lerma. He said he was going to take Michael Lerma down. He appeared to hate Michael Lerma. He said he would do whatever it took to take Lerma down. He talked about seeing Michael Lerma and the other guys (defendants) in suits and said they looked like cops. This is an insult in prison. It is meant as a means of disrespect.

9. While I was housed in the SHU with Slim, Daniel Navarro was also housed there. I would describe Daniel Navarro as a "legal beagle". He is always in the library and has boxes of papers. He is always kind; he always gives inspirational words. He is a good person. He helps people with their cases too.

10. Slim gave me some kites to pass to Daniel Navarro. I saw Slim fish kites.

11. Slim was always trying to get drugs. He used drugs in the SHU.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on this 19th day of September 2025, at Los Angeles, California.

_____
Johnny Macias

2

# Exhibit B

# DECLARATION OF DANIEL NAVARRO

I, Daniel Navarro, declare as follows:

1. I am presently detained at the Los Angeles Metropolitan Detention Center ("MDC-LA").

2. From July 2022 until August 2024, I was in custody at MDC-LA. During that time, I was housed in general population. On approximately August 25, 2024, I was moved to the Santa Ana City Jail. I returned to the MDC-LA on approximately February 20, 2025.

3. Upon my return to MDC-LA on approximately February 20, 2025, I was housed in what is known to me as the SHU, or the Special Housing Unit. My initial housing assignment at the time was on 8 North, in Cell 839. I was then moved to Cell 830.

4. After getting settled into that cell, I became familiar with some of the other inmates who were housed on C Range. I specifically recall one individual who identified himself as "Slim." "Slim" informed me that he was a member of what he referred to as the "Green Light Gang." Slim claimed that he was second in command of the gang and that an individual he referred to as "Creeper" was the person in charge.

5. According to what I have learned while detained at MDC-LA, the members of the Green Light Gang are inmates who have dropped out of their street gangs, inmates who have been moved into protective custody, or inmates who are cooperating with the government.

6. Slim wrote four separate "kites" to me over a roughly 30-day period that started in late February and extended into the month of March, 2025.

7. "Kites" are handwritten notes on small pieces of paper, usually attached to a string so that they can be passed from inmate to inmate on a housing range. It is my experience that this form of communication is used frequently throughout jails and prisons.

8. The four kites that Slim sent me while we were both housed on C Range were passed to me through a number of other inmates who I know as "Player," "Bad Boy," and "G".

9. It is my recollection that Slim was in Cell 822 during a part of this time period, and that G was in Cell 829. I believe that Player was in Cell 827 and that Bad Boy was in Cell 828. I believe that Slim initially sent all four of the kites I received to Player, who then passed them Bad Boy or G, who then passed them to me.

10. I am no longer in possession of the four kites sent to me by Slim, but I clearly remember receiving each kite as well as their content. I am no longer in possession of these four kites because my cell was "tossed" by BOP staff prior to when I left the SHU on approximately April 23, 2025, and returned to general population. I believe that my cell was tossed because I was involved in a hunger strike.

11. In the first kite I received from Slim, he introduced himself and explained why he was in the SHU. To the best of my recollection, he wrote, "My boy, Slim here in the SHU. I'm PC'd up." At one point in that kite, he also mentioned, "I took out my cellie, was under a bad one."

12. I understood this to mean that Slim was telling me that he killed his cellmate while he was under the influence and was having a bad "trip."

13. To the best of my recollection, this kite from Slim also said, "I did something you're familiar with, I had to strangle him." I understood this to mean that Slim killed his cellmate by strangling him.

//
//
//
//

14. While I do not recall the exact words he used in the kite, Slim also explained that he was testifying against inmates who were charged with the murder of his cellmate. To the best of my recollection, this kite said, "I was using that to get less time. They did me wrong, now I'm doing them wrong." It is my recollection that Slim also explained that he felt intimidated by these individuals. It is my impression that the words "they" and "them" refer to the inmates who were on trial for the murder of Slim's cellmate.

15. The second kite I received from Slim asked how he should approach his case. Slim was asking me to advise him of the best approach regarding strategy.

16. The third kite I received from Slim talked about his cellmate in the SHU. He shared with me his cellmate's nickname and charges, which included firearm and drug distribution offenses.

17. The fourth and final kite I received from Slim complimented me about my legal knowledge. Slim also mentioned that he was possibly moving to a protective custody unit on 7 North and asked me if I wanted to move to 7 North with him and other members of the Green Light Gang. Slim stated that if I were to join the Green Light Gang, I would be a "strong upgrade" to their organization, and so I would be Slim's bodyguard.

18. I have been informed by the attorneys for a defendant named Carlos Gonzalez, who I am informed was one of the defendants charged with and convicted of the murder of Slim's cellmate, that this declaration may be filed in support of one or more post-trial motions by the defendants in the case *United States v. Michael Lerma*, et al., Case No. 18-cr-172-GW, and that it is possible that I may be called as a witness at a hearing on those motions.

3

1 | I declare under penalty of perjury under the laws of the United States of America
2 | that the foregoing is true and correct. Executed on this 21st day of September 2025, at
3 | Los Angeles, California.
4
5 | _____
  | Daniel Navarro

4